No. 25-1832

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

**THE SUMMIT CHURCH-HOMESTEAD HEIGHTS BAPTIST CHURCH, INC.,**

*Plaintiff-Appellee,*

v.

**CHATHAM COUNTY, NORTH CAROLINA BOARD OF COMMISSIONERS,**

*Defendant-Appellant.*

On Appeal from the United States District Court for the Middle District of North Carolina, Greensboro Division, No. 1:25-cv-00113-UA-JLW, Hon. William L. Osteen, U.S. District Court Judge

## BRIEF OF *AMICUS CURIAE* THE JEWISH COALITION FOR RELIGIOUS LIBERTY IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE

Nicholas R. Reaves
FREE EXERCISE CLINIC
YALE LAW SCHOOL
1919 Penn. Ave. NW, Suite 400
Washington, DC 20006
(202) 349-7212
nicholas.reaves@yale.edu

Phillip Shaverdian
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, CA 90071
(213) 896-6000
pshaverdian@sidley.com

Dino L. LaVerghetta
*Counsel of Record*
Sam Burdyl
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
dlaverghetta@sidley.com
sam.burdyl@sidley.com

Robert D. Capodilupo
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
(617) 224-0304
rcapodil@sidley.com

*Counsel for* Amicus Curiae *The Jewish Coalition for Religious Liberty*

## TABLE OF CONTENTS

Interest of Amicus ................................................................................. vi

Rule 29(a) Statement............................................................................viii

Introduction ........................................................................................... 1

Argument ............................................................................................... 3

I.    Proper Application of RLUIPA is Especially Important to
      Jewish Communities.. ..................................................................... 3

      A.    RLUIPA Was Enacted Against a Backdrop of Overt
            and Covert Discrimination That Included
            Discrimination Against Jewish Land Uses............................ 3

      B.    The County's Rationale for Rejecting Summit Church
            Would Fall Especially Harshly on Observant Jews ............... 6

II.   RLUIPA's Equal Terms Provision Requires an Objective,
      Evenhanded Comparison to Secular and Religious
      Assemblies. ................................................................................... 11

      A.    The Equal Terms Inquiry Must Be Tied to Accepted
            Zoning Criteria, Not to Subjective Labels That Erase
            Comparable Secular Uses..................................................... 11

      B.    Under Any Objective Metric, the County's Approval of
            Herndon Farms Shows that it Subjected Summit
            Church to Unequal Treatment ............................................. 15

III.  RLUIPA Prohibits the Government from Reducing Houses of
      Worship to Foregone Tax Revenue……………………………….. 17

Conclusion............................................................................................. 20

Certificate of Compliance .................................................................... 22

Certificate of Service……………………………………………………… 23

ii

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Al-Alamin v. Gramley*,
    926 F.2d 680 (7th Cir. 1991) ................................................................ 8

*Alive Church of the Nazarene, Inc. v. Prince William County*,
    59 F.4th 92 (4th Cir. 2023) ........................................................ 12, 15

*Bais Brucha Inc. v. Twp. of Toms River*,
    2024 WL 863698 (D.N.J. Feb. 29, 2024) ............................................ 9

*Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of
    Litchfield*, 2017 WL 5015624 (D. Conn. Nov. 2, 2017) ...................... 10

*Congregation Etz Chaim v. City of Los Angeles*,
    2011 WL 12472550 (C.D. Cal. July 11, 2011) ..................................... 9

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of
    Pomona*, 138 F. Supp. 3d 352 (S.D.N.Y. 2015) .............................. 5, 8

*Jesus Christ Is the Answer Ministries, Inc. v. Baltimore
    County*, 915 F.3d 256, 263 (4th Cir. 2019) ...................................... 14

*Lighthouse Inst. for Evangelism, Inc. v. City of Long Beach*,
    510 F.3d 253 (3d Cir. 2007) (Jordan, J., concurring in
    part) ...................................................................................................... 12

*Midrash Sephardi, Inc. v. Town of Surfside*,
    366 F.3d 1214 (11th Cir. 2004) ........................................................... 5

*Reaching Hearts Int'l, Inc. v. Prince George's County*, 584 F.
    Supp. 2d 766 (D. Md. 2008), *aff'd* 368 Fed. Appx. 370 (4th
    Cir. 2010) ............................................................................................ 14

*Shelley v. Kraemer*,
    334 U.S. 1 (1948) .................................................................................. 4

*Summit Church-Homestead Heights Baptist Church, Inc. v.*
*Chatham Cnty. Bd. of Comm'rs*, No. 1:25-cv-00113
(M.D.N.C. June 20, 2025), Dkt. No. 27 ................. 6, 7, 9, 15, 16, 17, 19

*Westchester Day Sch. v. Vill. of Mamaroneck,*
504 F.3d 338 (2d Cir. 2007) ............................................................. 5, 8

*Winterton Props., LLC v. Town of Mamakating Zoning Bd. of*
*Apps.*, 132 A.D.3d 1141 (N.Y. App. Div. 2015) ..................................... 7

**Statutes and Regulations**

42 U.S.C. § 2000cc .......................................................................... 5, 11, 17

42 U.S.C. § 2000cc-3 ........................................................................ 12, 16

146 Cong. Rec. S7774 (July 27, 2000) ............................................... 4, 5, 11

**Other Authorities**

Mark Chaves & Alison J. Eagle, *Congregations and Social*
*Services: An Update from the Third Wave of the National*
*Congregations Study*, 7 RELIGIONS 55 (2016) ..................................... 18

Ram A. Cnaan & Stephanie C. Boddie, *Philadelphia Census*
*of Congregations and Their Involvement in Social Service*
*Delivery*, 75 SOC. SERV. REV. 559 (2001) ........................................... 18

Eric Eisner, *"Suffer Not the Evil One": Unitarianism and the*
*1826 Maryland Jew Bill*, 44 J. RELIGIOUS HIST. 338 (2020) ............... 4

Ari Feldman, *Why A Sleepy New Jersey Suburb Targeted*
*Hasidic Jews With 'Anti-Semitic' Laws*, FORWARD (Nov.
26, 2017) .......................................................................................... 8

Eitan Hersh & Laura Royden, *Antisemitic Attitudes Across*
*the Ideological Spectrum*, 76 POL. RSCH. Q. 697 (2022) ...................... 4

Adam Kovac, *NJ Mayor Accused of Antisemitism Loses*
*Primary to Candidate Also Accused of Antisemitism*,
FORWARD (June 7, 2023) .................................................................. 18

iv

S.Z. Lesches, *Understanding Mikvah: An Overview of Mikvah Construction* (2001) ................................................................. 7

Partners for Sacred Places, *The Economic Halo Effect of Rural United Methodist Churches in North Carolina* (2021) ..................................................................................... 19

Garrett Power, *The Residential Segregations of Baltimore's Jews*, GENERATIONS (1996) ........................................................ 4

George Washington, *Letter to the Hebrew Congregation in Newport, Rhode Island* (Aug. 18, 1790) ................................... 3

## INTEREST OF AMICUS

The Jewish Coalition for Religious Liberty (JCRL) is a cross-denominational association of rabbis, lawyers, and professionals who practice Judaism and are committed to defending religious liberty. As adherents of a minority religion, JCRL's members have a strong and unique interest in ensuring that religious liberty rights are protected. The group aims to protect the ability of all Americans to freely practice their faith and to foster cooperation between Jews and other faith communities. To that end, JCRL's leaders have filed amicus briefs in federal and state courts, published op-eds in prominent news outlets, and established an extensive volunteer network to spur public statements and action on religious liberty issues by Jewish communal leadership. JCRL has also served as plaintiffs' counsel in litigation addressing the free exercise and free speech rights of Jewish individuals and organizations. *See, e.g.*, *Young Isr. of Tampa v. Hillsborough Area Reg'l Transit Auth.*, No. 8:21-cv-00294 (M.D. Fla. filed Feb. 5, 2021) (challenging restrictions on religious speech in advertising).

In light of its organizational purposes, JCRL has an interest in preserving RLUIPA's protections and frequently appears as *amicus* to

provide a broader perspective on RLUIPA, including the protections the law affords the Jewish community. JCRL tenders this brief to provide that context and to offer a different perspective as to why the district court was correct to find that the Plaintiff is likely to succeed on the merits of its RLUIPA claim.

## RULE 29(a) STATEMENT

Amicus obtained consent to file this brief from both Plaintiff-Appellee and Defendant-Appellant.

This brief is submitted pursuant to Rule 29 of the Federal Rules of Appellate Procedure. No party or party's counsel authored this brief in whole or in part; no party or party's counsel contributed money to fund the preparation or submission of this brief; and no other person except amicus curiae, its members, or its counsel contributed money intended to fund the preparation or submission of this brief.[1]

---

[1] This brief has been prepared in part by a clinic operated by Yale Law School, but it does not purport to present the School's institutional views, if any.

viii

## INTRODUCTION

Chatham County excluded Summit Church despite having previously approved a 55+ community and care center, Herndon Farms, to occupy the same site. The County claimed the Church was too big, even though Herndon Farms was bigger. The County claimed the Church was a bad "fit" for the community, even though the County's zoning plan explicitly allowed for houses of worship. And when ultimately confronted about the burden that its decision would place upon churchgoers, the County argued that no such burden existed because congregants could simply go worship elsewhere. Under these facts, it is clear that the County's actions violated RLUIPA and the district court's decision should be affirmed. In support of that result, JCRL seeks to emphasize three points.

*First*, faithful application of RLUIPA is especially important to religious minorities. Congress enacted the statute against a record showing that synagogues, churches, and other religious assemblies were frequently burdened through individualized zoning processes and exclusionary judgments masked as neutral planning concerns. That danger is especially acute for observant Jewish communities, whose

1

religious life often depends on land uses and religious requirements that may be unfamiliar to local officials. Accordingly, it is important for this Court to clearly repudiate the County's use of cultural "fit" as a basis to reject Summit Church and make clear that the burden imposed by the County's decision is not obviated by the fact that congregants can worship at a more distant location.

*Second*, while the district court was correct in finding that the County's actions violated the substantial burden provision of RLUIPA, those actions are equally violative of the equal terms provision of the statute. This Court should make clear that, under the equal terms provision, a governmental body cannot deny an application by a house of worship while simultaneously approving a secular use of the property that would have the same impact on legitimate government interests.

*Third*, this Court should make clear that RLUIPA forbids using foregone tax revenue as a basis to reject a house of worship. Houses of worship are generally tax exempt. Accordingly, if the government could exclude a church based on the fact that a secular use would provide more tax revenue, religious use would be perpetually and categorically disfavored. RLUIPA does not countenance such a result. To the contrary,

RLUIPA recognizes the intrinsic value of religious use, and the American experience has shown that houses of worship provide significant fiscal and spiritual value to the communities that they call home.

## ARGUMENT

### I. PROPER APPLICATION OF RLUIPA IS ESPECIALLY IMPORTANT TO JEWISH COMMUNITIES.

For Jewish communities in the United States, faithful application of RLUIPA is essential to the protection of religious exercise from discrimination disguised as neutral zoning.

#### A. RLUIPA Was Enacted Against a Backdrop of Overt and Covert Discrimination That Included Discrimination Against Jewish Land Uses.

The United States has long aspired to be a welcoming home for Jews. In his 1790 letter to the Hebrew Congregation in Newport, President George Washington assured the "Children of the Stock of Abraham" that in this country every person would "sit in safety under his own vine and figtree, and there shall be none to make him afraid." George Washington, *Letter to the Hebrew Congregation in Newport, Rhode Island* (Aug. 18, 1790), https://perma.cc/BPK5-HGNW. That promise of liberty of conscience remains one of the Nation's proudest commitments.

3

But America has never been entirely free from anti-Semitism. American Jews have faced both formal and informal exclusion, from religious tests and residential restrictions to vandalism and violence. *See, e.g.*, Eitan Hersh & Laura Royden, *Antisemitic Attitudes Across the Ideological Spectrum*, 76 Pol. Rsch. Q. 697 (2023); Eric Eisner, *"Suffer Not the Evil One": Unitarianism and the 1826 Maryland Jew Bill*, 44 J. Religious Hist. 338 (2020); Garrett Power, *The Residential Segregation of Baltimore's Jews*, Generations (1996), https://perma.cc/4TJ9-4CBL; *Shelley v. Kraemer*, 334 U.S. 1, n.26 (1948). And in the land-use context, discrimination often does not announce itself openly. More often, it is veiled in neutral planning language and discretionary criteria.

Congress enacted RLUIPA against that backdrop. In the joint statement accompanying the statute, Senators Hatch and Kennedy explained that "[c]hurches and synagogues cannot function without a physical space adequate to their needs and consistent with their theological requirements," and that the hearing record showed this right was "frequently violated." 146 Cong. Rec. S7774 (daily ed. July 27, 2000). They further noted that, while some local officials or neighbors sometimes offered religion openly as the reason for exclusion, "[m]ore

4

often, discrimination lurks behind such vague and universally applicable reasons as traffic, aesthetics, or 'not consistent with the city's land use plan.'" *Id.* Congress specifically identified "Jewish shuls and synagogues" among the religious institutions targeted through these discretionary processes. *Id.*

RLUIPA responded by codifying two central protections in the land-use context: the government may not impose a substantial burden on religious exercise absent a compelling interest pursued through the least restrictive means (the substantial burden provision in 42 U.S.C. § 2000cc(a)(1)), and the government may not treat religious assemblies on less than equal terms with comparable secular ones (the equal terms provision in 42 U.S.C. § 2000cc(b)(1)). 42 U.S.C. § 2000cc(a)(1), (b)(1). Courts have repeatedly applied those protections to Jewish institutions burdened by land-use regulation. *See, e.g.*, *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214 (11th Cir. 2004); *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338 (2d Cir. 2007); *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352 (S.D.N.Y. 2015).

Jewish communities continue to depend on RLUIPA because observance often requires particular places, proximity, and institutions that may not fit conventional expectations. Robust enforcement of the statute is therefore not incidental to religious pluralism—it is one of the key legal safeguards that makes pluralism possible.

### B. The County's Rationale for Rejecting Summit Church Would Fall Especially Harshly on Observant Jews.

The County advanced two related rationales for rejecting Summit Church that would cause significant harm if applied to Jewish communities. First, the County said that Summit was the wrong "fit" for Chatham County, asserting it was too large and inconsistent with the County's rural character and sense of place. *See* Mem. Op. & Order 9–10, 16–19, *Summit Church-Homestead Heights Baptist Church, Inc. v. Chatham Cnty. Bd. of Comm'rs*, No. 1:25-cv-00113 (M.D.N.C. June 20, 2025), Dkt. No. 27 ("Order"). Second, the County was dismissive of any burden of its decision on Summit's congregation, effectively arguing that congregants could continue traveling to a more distant site for church. *Id.* at 17. Both rationales would be especially harmful if directed at observant Jewish communities.

6

Start with the County's "fit" rationale. The County's own land-use plan expressly contemplates churches as part of the development "fabric" of this area. *Id.* at 6–7. Nonetheless, officials still somehow found that Summit was a "poor fit" for the community and suggested that Chatham County was simply "not a place to call home for that size of a church." *Id.* at 10, 18, 26–27. That kind of open-ended reasoning is dangerous for minority faiths because it allows decisionmakers to give preferential treatment to religious uses they regard as familiar or culturally comfortable, while excluding dissimilar faiths.

Jewish religious life often depends on land uses that do not resemble a majoritarian image of a "church." A mikvah, for example, is a ritual-immersion structure so important to Judaism that it must be built even before the synagogue. *See* S.Z. LESCHES, UNDERSTANDING MIKVAH: AN OVERVIEW OF MIKVAH CONSTRUCTION 33 (2001). A mikvah may not resemble, in form or appearance, what is commonly understood to be a house of worship. But these religious spaces enjoy RLUIPA protection all the same. *See Winterton Props., LLC v. Town of Mamakating Zoning Bd. of Apps.*, 132 A.D.3d 1141, 1141 (N.Y. App. Div. 2015) (reversing zoning

7

board ruling that a "mikvah did not constitute a neighborhood place of worship").

The same is true of other religious institutions that combine worship, study, and communal life in ways unfamiliar to local officials. Municipalities have repeatedly invoked traffic, scale, and "character" concerns against such Jewish uses. *See, e.g.*, *Tartikov*, 138 F. Supp. 3d at 420; *Westchester Day Sch.*, 504 F.3d at 351–52. RLUIPA exists to prevent the government from using such elastic concepts to exclude minority religious institutions that do not fit local expectations. *See Al-Alamin v. Gramley*, 926 F.2d 680, 686 (7th Cir. 1991) ("[R]ights . . . belonging to minority or non-traditional religions must be respected to the same degree as the rights . . . belonging to larger and more traditional denominations.").[2]

---

[2] Even more troubling, some localities have argued that allowing adherents to minority religions to move in will, in and of itself, threaten the character of the community. Ari Feldman, *Why A Sleepy New Jersey Suburb Targeted Hasidic Jews With 'Anti-Semitic' Laws*, FORWARD (Nov. 26, 2017), https://perma.cc/F3B9-X9GJ; Adam Kovac, *NJ Mayor Accused of Antisemitism Loses Primary to Candidate Also Accused of Antisemitism*, FORWARD (June 7, 2023), https://perma.cc/QE8J-2Z3W. This animus-based appeal to preserving the character or culture of the town by excluding minority faiths is the clearest possible example of a RLUIPA violation.

It is equally troubling that the County has defended its actions by effectively arguing that congregants are not burdened by the County's zoning decision because they can simply drive somewhere else to attend church. Chair Howard dismissed Summit's asserted burden by observing that some congregants were "already commuting to a Summit Church somewhere that they're clearly comfortable with commuting to." Order at 17. But for many Orthodox Jews, proximity to a synagogue is not a mere convenience, but a religious necessity. Because the Orthodox understanding of Jewish law forbids driving on Shabbat and certain other holy days, many observant Jews must be able to walk to a synagogue and to other important religious institutions. Their ability to attend synagogue—and to participate fully in communal religious life— thus depends on living within walking distance thereto.

Courts have recognized as much in the zoning context. *See Congregation Etz Chaim v. City of Los Angeles*, 2011 WL 12472550, at *7 (C.D. Cal. July 11, 2011) (recognizing that Orthodox Jewish congregation was "particularly burdened" where denial would force members to travel too far to worship and rejecting unsupported traffic concerns); *Bais Brucha Inc. v. Twp. of Toms River*, 2024 WL 863698, at *12 (D.N.J. Feb.

9

29, 2024) (recognizing land-use regulations may "especially impact options for Orthodox Jewish residents to establish Orthodox Jewish houses of worship within walking distance from their homes, as required by their religious beliefs"); *Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfield*, 2017 WL 5015624, at \*26 n.15 (D. Conn. Nov. 2, 2017) ("[I]t would be substantially burdensome for the Chabad House itself to be relegated to the outskirts of town.").

If local officials may say, in effect, that worshippers can simply drive somewhere else, then many Orthodox Jewish communities could be denied any realistic opportunity to establish a synagogue or related religious institution near where members of their community live. RLUIPA does not tolerate that result.

Affirming the district court would protect more than Summit Church. It would reaffirm that local governments may not use subjective notions of communal "fit" to exclude minority faiths from a community. It would make clear that "you can go worship somewhere else" is not a sufficient justification to prevent the faithful from worshiping in the communities in which they live. And it would ensure that fundamental rights do not yield to local whims.

10

## II.  RLUIPA'S EQUAL TERMS PROVISION REQUIRES AN OBJECTIVE, EVENHANDED COMPARISON TO SECULAR AND RELIGIOUS ASSEMBLIES.

While the district court correctly found that the County's actions violated RLUIPA's substantial burden provision, it is important to emphasize that the County's actions violated the equal terms provision as well. This is unequivocally demonstrated by the fact that the County's denial of Summit Church came after the County previously approved the same site to be used for a much larger 55+ development, "Herndon Farms," featuring 161 residences and a 140,000 square-foot congregant care-facility.

### A.  The Equal Terms Inquiry Must Be Tied to Accepted Zoning Criteria, Not to Subjective Labels That Erase Comparable Secular Uses.

RLUIPA provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). Congress enacted that provision because zoning authorities were often permitting "theaters, meeting halls, and other places where large groups of people assemble for secular purposes" while excluding religious ones. 146 Cong. Rec. S7774. And

11

Congress directed courts to construe RLUIPA "in favor of a broad protection of religious exercise." 42 U.S.C. § 2000cc-3(g).

This Court's cases reflect that breadth. Under *Alive Church of the Nazarene, Inc. v. Prince William County*, the relevant question is whether the government excludes a religious assembly while permitting a secular assembly that undermines the government's accepted regulatory purpose in the same way. 59 F.4th 92, 102 (4th Cir. 2023) (citing *River of Life Kingdom Ministries v. Vill. of Hazel Crest*, 611 F.3d 367, 370 (7th Cir. 2010)).[3]

That framework matters because religious assemblies rarely have exact secular twins. If courts demanded evidence of identical rather than comparable effects on accepted zoning criteria, localities could evade RLUIPA simply by identifying some difference in institutional form. *See Lighthouse Inst. for Evangelism, Inc. v. City of Long Beach*, 510 F.3d 253, 293 (3d Cir. 2007) (Jordan, J., concurring in part) (warning that

---

[3] JCRL submitted an amicus brief in support of Alive Church and maintains (as it argued in that brief) that a plain-text reading of RLUIPA's equal terms provision best protects religious exercise. Here, amicus argues that Summit Church must prevail even under *Alive Church*'s interpretation of the equal terms provision.

otherwise "creative municipal officials and their lawyers" could find functional differences between religious and secular entities).

When looking at comparators based on regulatory purposes, RLUIPA requires those regulatory purposes to be tethered to concrete, accepted land use concerns. Objective criteria can then be evenhandedly applied across religious and secular uses. Otherwise, a locality can define its objectives so narrowly and so subjectively that no comparator remains and every exclusion becomes self-justifying.

The danger is greatest when the municipality's regulatory purpose under the equal terms analysis is framed in open-ended terms such as "compatibility," "character," or "fit." Courts confronting these kinds of vague regulatory purposes must examine whether the asserted concern was applied objectively, or instead was used as an elastic proxy for exclusion. While facially neutral, subjective regulatory purposes leave room for discriminatory application in a way that objective regulatory purposes do not allow for.

For instance, in *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore County*, this Court held that a church plausibly alleged RLUIPA violations where neighborhood hostility and broad compatibility

13

concerns infected the zoning process. 915 F.3d 256, 259–64 (4th Cir. 2019). In *Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*, the district court rejected the county's "conclusory assertion" that a proposed church was "out of character with the surrounding neighborhood," explaining that the claim was "belied by the permitted status of churches" in the zone. 584 F. Supp. 2d 766, 796 (D. Md. 2008), *aff'd*, 368 F. App'x 370 (4th Cir. 2010). And in *Westchester Day Sch.*, the Second Circuit held that arbitrary reliance on traffic, intensity, and neighborhood concerns supported relief where the record suggested the school had not been treated in an even-handed fashion to secular institutions. 504 F.3d at 351–52.

That is how RLUIPA should operate here as well. Compatibility arguments deserve scrutiny precisely because they can conceal discrimination while sounding neutral. When a locality approves comparable secular development but declares religious land use uniquely incompatible, courts must look past the label and assess the actual regulatory impact.

14

**B.    Under Any Objective Metric, the County's Approval of Herndon Farms Shows that it Subjected Summit Church to Unequal Treatment**

The case at hand presents an unusually straightforward comparator. Herndon Farms involved the same six parcels at issue here. Order at 4. The County approved that secular project in 2022 even though it contemplated 161 residential units, a 140,000 square foot congregate care facility, a 10,000 square foot office/daycare, and an event barn. *Id.* Summit Church later sought to use the same property for a church campus, and the County rejected the proposal as too large, inconsistent with the rural character, unsafe for traffic, and inadequate in tax and job generation. *Id.* at 9–10, 16–19, 27–28.

Under *Alive Church,* that comparison is enough to show that the Count is violating RLUIPA. *See* 59 F.4th at 102. If the relevant criteria are scale, traffic, intensity of use, impact on surrounding development, or consistency with the site's location, Herndon Farms affected those interests at least as much as Summit Church would. If the relevant criterion is consistency with the County's zoning plan, Summit Church has the stronger case still, because the plan specifically states that churches may be part of the fabric of this "Compact Residential" area,

15

and County staff originally deemed Summit Church's proposal consistent with the plan. Order at 6–7, 35.

The County's reliance on "fit" only underscores the equal terms problem here. A larger secular development was acceptable for the property, but a church was not. If "fit" can be defined at that level of subjectivity, then the equal terms provision will never do any work. A county could always say that the religious use is different because it is religious, because it gathers at different times, because it does not generate taxes, or because it does not match the county's preferred aesthetic or cultural profile. RLUIPA forbids that kind of cramped analysis. *See* 42 U.S.C. § 2000cc-3(g) ("This chapter shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.").

This Court has the opportunity to reiterate what precedent makes clear: a locality may not approve a larger secular development for the same site and then use amorphous notions of "fit," "character," or fiscal preference to reject a religious assembly. Under any objective metric, Summit Church was not treated on equal terms.

16

## III. RLUIPA PROHIBITS THE GOVERNMENT FROM REDUCING HOUSES OF WORSHIP TO FOREGONE TAX REVENUE.

The County repeatedly justified its decision by arguing that Summit Church would not diversify the tax base or generate high-quality jobs. Order at 16, 18–19, 37–40. But RLUIPA recognizes that religion has intrinsic value to the community that cannot be reduced to foregone tax revenue. And the County's argument is flawed both legally and empirically.

Houses of worship are ordinarily tax-exempt by design. Accordingly, RLUIPA would be hollow if local governments could exclude houses of worship whenever a taxable secular use would produce more tax revenue. Far from ensuring religious uses are on "equal terms" with secular uses, religion would be categorically disfavored. Congress enacted RLUIPA to guard against precisely that kind of structural inequality in land use regulation. *See* 42 U.S.C. § 2000cc(b)(1).

Aside from being legally impermissible, the County's logic ignores the immense value that houses of worship bring to a community outside of tax revenues. The County emphasizes what a church does not provide—commercial tax revenue—while ignoring what houses of

17

worship do, in fact, provide to the community. In addition to providing a sense of community, providing a space for important life-cycle events, and caring for the spiritual needs of community members, research has repeatedly shown that religious communities are major suppliers of social services and civic goods to the broader public. *See, e.g.*, Mark Chaves & Alison J. Eagle, *Congregations and Social Services: An Update from the Third Wave of the National Congregations Study*, 7 RELIGIONS 55, at 1, 4 (2016); Ram A. Cnaan & Stephanie C. Boddie, *Philadelphia Census of Congregations and Their Involvement in Social Service Delivery*, 75 SOC. SERV. REV. 559 (2001). Those activities can include food assistance, health-related services, clothing distributions, housing support, volunteer mobilization, and valuable partnerships with other community organizations. Simply put, the County's analysis ignores the well-documented "halo effect" created by religious communities.

North Carolina-specific research points in the same direction. In a statewide study of rural United Methodist congregations, for example, Partner for Sacred Places and the UNC Charlotte Urban Institute found that an average congregation generated more than $735,000 in annual economic benefits for their local communities, and 72% of those impacted

18

were not congregants. *See* Partners for Sacred Places, *The Economic Halo Effect of Rural United Methodist Churches in North Carolina* 6 (2021), https://perma.cc/FU3V-LJV9. The study attributed that value to direct local spending, education and childcare, community serving programs, shared space, jobs, and the church's function as a community hub. *Id.* at 5, 15.

These findings are consistent with everyday experience. Houses of worship provide food pantries, counseling, youth programs, educational space, volunteer coordination, meeting space for recovery and civic groups, emergency relief, and community connection. They purchase goods and services locally. They employ staff. They attract visitors who spend money nearby. They are one of the few kinds of institutions whose explicit mission is to sustain relationships of trust, care, and mutual aid.

Even the County's zoning plan recognizes this. The plan states that houses of worship "remain central gathering places" in the county, and it explicitly values places for community gathering and social interaction. Order at 39; *see also id.* at 39–40 (recognizing that the Board's reliance on tax revenue and jobs "seems to run contrary to the recognized purpose and importance of churches in Chatham County"). The Board's tax-base

19

rationale thus ignored the very form of civic contribution that the County's own plan acknowledges churches are especially suited to provide.

The County's reliance on tax revenue thus cannot justify its exclusion of Summit Church under RLUIPA or on its own terms. Affirming the district court would make clear that local governments may not discount the substantial, well-documented civic and economic contributions of religious institutions simply because those contributions do not take the form of taxable commercial activity.

## CONCLUSION

RLUIPA provides a vital safeguard for the Jewish community and other religious minorities whose religious exercise is especially vulnerable to exclusion through discretionary land-use regulation. The judgment below should be affirmed, both to vindicate Summit Church's rights and to ensure that RLUIPA continues to provide robust protections for all religious communities.

20

Dated: March 30, 2026                    Respectfully submitted,

                                         */s/ Dino L. LaVerghetta*
Nicholas R. Reaves                       Dino L. LaVerghetta
FREE EXERCISE CLINIC                       *Counsel of Record*
YALE LAW SCHOOL                          Sam Burdyl
1919 Penn. Ave. NW, Suite 400            SIDLEY AUSTIN LLP
Washington, DC 20006                     1501 K Street NW
(202) 349-7212                           Washington, DC 20005
nicholas.reaves@yale.edu                 (202) 736-8000
                                         dlaverghetta@sidley.com
                                         sam.burdyl@sidley.com
Phillip Shaverdian
SIDLEY AUSTIN LLP
350 South Grand Avenue                   Robert D. Capodilupo
Los Angeles, CA 90071                    SIDLEY AUSTIN LLP
213) 896-6000                            60 State Street, 36th Floor
pshaverdian@sidley.com                   Boston, MA 02109
                                         (617) 224-0304
                                         rcapodil@sidley.com


*Counsel for* Amicus Curiae *The Jewish Coalition for Religious Liberty*

## CERTIFICATE OF COMPLIANCE

This brief was prepared in a 14-point Century Schoolbook proportional typeface, in compliance with Fed. R. App. P. 32(a)(5)-(6). Pursuant to Fed. R. App. P. 29(a)(4)(G) and 32(g), I certify, based on the word-counting function of Microsoft Word, that this brief complies with the type-volume limitations of Rule 29(a)(5), in that the brief contains 3,724 words, including footnotes but excluding portions of the brief that are not to be counted, which is less than half the allowable length of a party's principal brief.

/s/ *Dino L. LaVerghetta*
Dino L. LaVerghetta
  *Counsel of Record*
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
dlaverghetta@sidley.com

*Counsel for* Amicus Curiae *The Jewish Coalition for Religious Liberty*

22

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Dino L. LaVerghetta*
Dino L. LaVerghetta
   *Counsel of Record*
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
dlaverghetta@sidley.com

*Counsel for* Amicus
Curiae *The Jewish*
*Coalition for*
*Religious Liberty*

23

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1832__     Caption: __Summit Church-Homestead Heights Baptist Church v. Chatham County__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__The Jewish Coalition for Religious Liberty__
(name of party/amicus)

_____

who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

12/01/2019 SCC                                      - 1 -

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Dino L. LaVerghetta        Date: March 30, 2026

Counsel for: Jewish Coal. for Religious Liberty

- 2 -

Print to PDF for Filing